**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STRINGFELLOW MEMORIAL HOSPITAL, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALEX AZAR, in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>        Defendant. | Civil Action No. 17-309 (BAH)<br><br>Chief Judge Beryl A. Howell |
| DALLAS REGIONAL MEDICAL CENTER, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALEX AZAR, in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>        Defendant. | Civil Action No. 17-315 (BAH)<br><br>Chief Judge Beryl A. Howell |
| WEST ANAHEIM MEDICAL CENTER,<br>        *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALEX AZAR, in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>        Defendant. | Civil Action No. 17-880 (BAH)<br><br>Chief Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are cross-motions for summary judgment from the plaintiffs, several hospitals that offer inpatient and outpatient hospital services to patients entitled to benefits under the Medicare program, Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 15, and the defendant, the Secretary of Health and Human Services ("HHS"), who is sued in his official capacity, Def.'s Cross-Mot. Summ. J. ("Def.'s Mot."), ECF No. 17.[1] The plaintiffs seek judicial review of a final adverse agency decision by HHS and the vacatur of a 2005 final rule that allegedly reduced the payments that the plaintiffs should have received from HHS to compensate them for the disproportionate number of low-income patients served in their hospitals. *See* Pls.' Mot. at 1. The plaintiffs allege that the final rule at issue violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because the rule is procedurally defective and arbitrary and capricious. *See* Compl. ¶¶ 81–88, ECF No. 1; Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") at 2, ECF No. 15-1. The defendant counters that the final rule was a logical outgrowth of the proposed rule and that the adoption of the rule was the result of a reasoned deliberative process. *See* Def.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Def.'s Mem.") at 1, ECF No. 17-1. For the reasons set forth below, the plaintiffs' motions are denied and the defendant's motions are granted.

## I.     BACKGROUND

Resolving the instant motions requires examining the "labyrinthine world of Medicare reimbursements." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 48 (D.C. Cir. 2015)

---

[1]     Also pending before the Court are cross-motions for summary judgment filed in a consolidated case, which motions are identical to the cross-motions filed in the above-captioned case. *See* W. Anaheim Pls.' Mot. Summ. J., ECF No. 23; Def.'s W. Anaheim Cross-Mot. Summ. J., ECF No. 21. For ease of reference, all citations refer to the cross-motions filed in the above-captioned case.

(internal quotation marks omitted).  The relevant portions of the Medicare statute are explained first, followed by the rulemaking challenged by the plaintiffs.

## A.       Statutory Framework

Medicare is a federal program that pays for health-care services furnished to eligible beneficiaries, who are generally individuals over the age of sixty-five or individuals with disabilities.  *See* 42 U.S.C. § 1395c.  The Centers for Medicare and Medicaid Services ("CMS") is the component of HHS that administers the Medicare program.  *See St. Elizabeth's Med. Ctr. of Bos., Inc. v. Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005).  CMS reimburses health-care providers for, *inter alia*, "the reasonable cost" of services provided to Medicare beneficiaries.  *See* 42 U.S.C. § 1395f(b)(1).[2]

The Medicare statute has five parts, two of which are relevant to this case.  Part A "establishes the requirements that individuals must meet to be eligible for Medicare benefits and provides such individuals insurance for hospital and hospital-related services."  *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 916 (D.C. Cir. 2013) (citing 42 U.S.C. § 1395c).  Such benefits include coverage for "inpatient hospital services," including overnight stays in a hospital.  42 U.S.C. § 1395d.  Part A benefits are limited to a certain number of days, however, and after those days have been used, Part A coverage is "exhausted."  *Catholic Health*, 718 F.3d at 916.  "Specifically, Medicare beneficiaries are entitled to coverage for the first 90 days of their stay, and they may then elect to use up to 60 'lifetime reserve days' beyond the first 90 days."  *Id.* (quoting 42 C.F.R. § 409.61(a)); *see also* 42 U.S.C. § 1395d.

---

[2]          "Provider of services" is defined as "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health care agency, hospice program, or, for purposes of [other provisions] of this title, a fund."  42 U.S.C. § 1395x(u).

Part E, which sets out "Miscellaneous Provisions," works in tandem with Part A to provide a "prospective payment system for reimbursing hospitals that provide inpatient hospital services covered under Part A." *Catholic Health*, 718 F.3d at 916 (citing 42 U.S.C. § 1395ww(d)). As relevant to this case, Part E mandates that any hospital serving "a significantly disproportionate number of low-income patients" is entitled to a payment adjustment, known as the "disproportionate share hospital" ("DSH") adjustment, which is an upward adjustment to a hospital's reimbursement amount to account for the hospital's treatment of a disproportionately high number of low-income patients. 42 U.S.C. § 1395ww(d)(5)(F)(i)(I); *see also id.* § 1395ww(d)(2); Pls.' Mem. at 4 ("The DSH adjustment is an upward adjustment to standard rates to compensate hospitals for the generally higher per-patient costs of low-income patients."). As the D.C. Circuit has recognized, the DSH adjustment "is based on Congress's judgment that low-income patients are often in poorer health, and therefore costlier for hospitals to treat." *Catholic Health*, 718 F.3d at 916 (citing *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 177–78 (D.C. Cir. 2008)).

A hospital's DSH adjustment is based on its "disproportionate patient percentage" ("DPP"). 42 U.S.C. § 1395ww(d)(5)(F)(v). To qualify for a DSH adjustment, a hospital's DPP typically must exceed 15 percent, although the qualifying percentage varies depending on the size of the hospital and whether it is located in an urban or a rural area. *See id.* Generally, "a higher DPP means greater reimbursements because the hospital is serving more low-income patients." *Catholic Health*, 718 F.3d at 916. The DPP is a "'proxy measure' for the number of low-income patients a hospital serves and represents the sum of two fractions, commonly called the 'Medicare fraction' and the 'Medicaid fraction.'" *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 3 (D.C. Cir. 2011) (internal citation omitted) (quoting H.R. REP. NO. 99-241, pt. 1, at 17 (1985)). The Medicare fraction is statutorily defined as:

[T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under [Medicare] part A . . . and were entitled to supplementary security income [("SSI")] benefits . . . , and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under [Medicare] part A.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  The Medicaid fraction is defined as:

[T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid] plan . . . but who were not entitled to benefits under [Medicare] part A . . . , and the denominator of which is the total number of the hospital's patient days for such period.

*Id.* § 1395ww(d)(5)(F)(vi)(II).

As the D.C. Circuit has noted, "[t]his language is downright byzantine and its meaning not easily discernible." *Catholic Health*, 718 F.3d at 917.  In essence, "[t]he Medicare and Medicaid fractions represent two distinct and separate measures of low income—SSI (i.e., welfare) and Medicaid, respectively—that when summed together, provide a proxy for the total low-income patient percentage." *Id.*  The D.C. Circuit has often used the following visual representation to distill these formulas:

|  | Medicare Fraction | Medicaid Fraction |
|---|---|---|
| Numerator | Patient days for patients "entitled to benefits under part A" and "entitled to SSI benefits" | Patient days for patients "eligible for [Medicaid]" but not "entitled to benefits under part A" |
| Denominator | Patient days for patients "entitled to benefits under part A" | Total number of patient days |

*Id.*; *see also Ne. Hosp.*, 657 F.3d at 3.  The denominator of the Medicaid fraction—total number of patient days—is larger than the denominator of the Medicare fraction, which contains only patient days for those patients "entitled to benefits under part A."  Thus, shifting patient days from the numerator of the Medicaid fraction to the numerator of the Medicare fraction will generally have a larger impact on a hospital's DPP and, accordingly, on its DSH adjustment.

A "fiscal intermediary," such as a private insurance company that has a contract with CMS, is responsible for "[d]etermining the amount of payments to be made to providers for covered services furnished to Medicare beneficiaries" and then "[m]aking the payments" to the hospitals.  42 C.F.R. § 421.100(a)(1)–(2); *see also id.* § 421.3.  If a hospital providing covered services "is dissatisfied with a final determination of the organization serving as its fiscal intermediary" regarding "the amount of total program reimbursement due the provider," the hospital "may obtain a hearing with respect to such [determination] by a Provider Reimbursement Review Board" ("PRRB").  42 U.S.C. § 1395*oo*(a)(1)(A)(i).  To obtain such review, the hospital must "file[ ] a request for a hearing with 180 days after notice of the intermediary's final determination."  *Id.* § 1395*oo*(a)(3).  The PRRB may then "affirm, modify, or reverse a final determination of the fiscal intermediary."  *Id.* § 1395*oo*(d); *see also Ne. Hosp.*, 657 F.3d at 3–4.

PRRB decisions "shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the [PRRB's] decision, reverses, affirms, or modifies" the PRRB's decision.  42 U.S.C. §1395*oo*(f)(1).  Notably, however, the PRRB lacks the authority to declare statutes, regulations, or rules invalid.  *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 406 & n.4 (1988) (citing 42 U.S.C. § 1395*oo*(d)); 42 C.F.R. § 405.1867 (instructing that the PRRB "shall afford great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS").  Thus, when a hospital seeks to challenge the validity of a rule or regulation, the challenger must first obtain a determination by the PRRB, either on a petition or *sua sponte*, that the PRRB "lacks the authority to decide the legal question."  42 C.F.R. § 405.1842(a)(1) (citing 42 C.F.R. § 405.1867).  The hospital may then "request a [PRRB] decision that the provider is entitled to seek" expedited judicial review ("EJR") of the issue.  *Id.* § 405.1842(a)(2).  If the PRRB grants EJR, "the

provider may file a complaint in Federal district court in order to obtain EJR of the legal question." *Id.* §405.1842(g)(2).

**B.  Rulemaking History Leading to the 2005 Final Rule**

At issue in this lawsuit is the treatment of patient days in the Medicare fraction or the Medicaid fraction for individuals who were eligible for both programs—"dual eligible" individuals—but for whom Medicare did not pay for care, either because the patient had exhausted his or her Part A benefits for that period of hospitalization or because an entity other than the Medicare Trust Fund paid for that care.  *See* Pls.' Mem. at 1; Def.'s Mem. at 4. Specifically, this dispute centers on whether such "dual-eligible exhausted days" should be counted in the Medicare fraction or instead in the Medicaid fraction.  If dual-eligible exhausted days were included in the Medicare fraction, they would be added to the denominator of the Medicaid fraction and, if the patient had been entitled to SSI benefits, also to the numerator.  If dual-eligible exhausted days were included in the Medicaid fraction, they would be added to the numerator of the Medicaid fraction.  The denominator of the Medicaid fraction is not at issue, because that value includes *all* patient days regardless of eligibility or exhaustion.

This distinction matters, because the denominator of the Medicaid fraction (total patient days) is greater than the denominator of the Medicare fraction (patient days for patients "entitled to benefits under part A").  Thus, including dual-eligible exhausted days in the Medicare fraction denominator (and, when appropriate, numerator) rather than in the Medicaid fraction numerator will often tend to give those days more of an impact on a hospital's DPP and, correspondingly, on its DSH adjustment.  The relevant rulemaking history is described next.

**1.  *2004 Proposed Rule***

In 2003, the Secretary issued a proposed rule for the 2004 fiscal year outlining "proposed changes to the hospital inpatient prospective payment systems and fiscal year 2004 rates" for the

Medicare program. Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates ("2004 Proposed Rule"), 68 Fed. Reg. 27,154, 27,154 (May 19, 2003) (capitalization omitted). As it relates to this lawsuit, the Secretary proposed to revise the manner in which dual-eligible exhausted patient days are counted in the Medicare and Medicaid fractions. The 2004 Proposed Rule explained that currently, "[i]f a patient is a Medicare beneficiary who is also eligible for Medicaid, the patient is considered dual-eligible and the patient days are included in the Medicare fraction of the DSH patient percentage but not the Medicaid fraction." *Id.* at 27,207. Importantly, the 2004 Proposed Rule emphasized that:

> This policy currently applies even after the patient's Medicare coverage is exhausted. In other words, if a dual-eligible patient is admitted without any Medicare Part A coverage remaining, or exhausts Medicare Part A coverage while an inpatient, his or her patient days are counted in the Medicare fraction before and after Medicare coverage is exhausted. This is consistent with our inclusion of Medicaid patient days even after the patient's Medicaid coverage is exhausted.

*Id.* That is, under the stated status quo, dual-eligible days were to be counted in the denominator of the Medicare fraction (and, if the patient were entitled to SSI benefits, also in the numerator of the Medicare fraction), regardless of whether the patient had exhausted his or her available Medicare Part A coverage. The Secretary then explained that he was contemplating a change in the way dual-eligible exhausted days would be counted:

> We are proposing to change our policy, to begin to count in the Medicaid fraction of the DSH patient percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired. . . . As noted above, our current policy regarding dual-eligible patient days is that they are counted in the Medicare fraction and excluded from the Medicaid fraction, even if the patient's Medicare Part A coverage has been exhausted. . . . [I]n order to facilitate consistent handling of these days across all hospitals, we are proposing that the days of patients who have exhausted their Medicare Part A coverage will no longer be included in the Medicare fraction. Instead, we are proposing these days should be included in the Medicaid fraction of the DSH calculation.

*Id.* at 27,207–08.  In other words, the Secretary proposed adopting the opposite of the stated current policy: rather than continue to count dual-eligible days, regardless of whether Part A coverage had been exhausted, in the appropriate parts of the Medicare fraction, the Secretary proposed to begin counting only dual-eligible unexhausted days in the Medicare fraction while counting dual-eligible exhausted days in the Medicaid fraction.

## 2.  *Initial Comment Period for the 2004 Proposed Rule*

The comment period on the 2004 Proposed Rule remained open through July 18, 2003.  *Id.* at 27,154.  Many commenters supported the policy that the Secretary had described as the existing policy—namely, the inclusion of dual-eligible days in the denominator (and, when entitled to SSI benefits, also in the numerator) of the Medicare fraction, regardless of whether the patient's Part A coverage had been exhausted—and opposed the proposed change to begin including dual-eligible exhausted days in the numerator of the Medicaid fraction.  As discussed below, this is the policy that the Secretary ultimately adopted in the 2005 Final Rule.  The American Hospital Association ("AHA") opposed the proposed change because "CMS provide[d] no justified reason for making this change, and there are clear reasons *not* to make this change."  Administrative Record ("AR") at 754R, ECF No. 30-1 (emphasis in original).  The AHA noted that "CMS clearly states in the proposed rule that the current formula is consistent with statutory intent" and that "the proposed change would place a significant new regulatory and administrative burden on hospitals."  *Id.*  In addition, the AHA explained that "it is likely that this proposed change would result in reduced DSH payments to hospitals" because "[a]ny transfer of a particular patient day from the Medicare fraction (based on total *Medicare* patient days) to the Medicaid fraction (based on *total* patient days) will dilute the value of that day, and therefore reduce the overall patient percentage and the resulting DSH adjustment.  *Thus the*

*calculation of dual-eligible days must not be changed.*"  *Id.* at 754–55R (emphasis in original).

Other commenters likewise emphasized that the stated current policy was consistent with

statutory intent and that the change would result in large administrative burdens for hospitals.

*See, e.g.*, *id.* at 486R (comments of Association of American Medical Colleges that "current

policy is consistent with statutory intent" and that proposed policy will impose a "new

administrative burden . . . on hospitals to provide documentation"); *id.* at 583R (comments of

Healthcare Association of New York State that "it will be difficult for hospitals to provide the

data required under this proposal"); *id.* at 718R (comments of University of Pittsburgh Medical

Center Health System opposing the proposal "due to the additional workload that will be applied

to the providers' limited resources"); *id.* at 816R (comments of National Association of Public

Hospitals and Health Systems noting the "significant new regulatory and administrative burden

on hospitals" imposed by proposed rule).

   Other commenters emphasized the likelihood that DSH payments would decrease under

the proposed rule.  For example, the National Association of Public Hospitals and Health

Systems noted that the proposed rule would "have the effect of reducing DSH payments across-

the-board" because "the transfer of any particular patient day from the Medicare to the Medicaid

fraction will always dilute the value of that day and therefore reduce the overall patient percentage

and the resulting DSH adjustment."  *Id.* at 816R; *see also id.* at 683R (comments of Mercy Hospital

that "[t]he result will be a loss ranging from approximately ($500,000) to ($800,000) for each

1,000 days adjusted based on a varied Medicaid eligibility percentage from 100% to 0%"); *id.* at

789R (comments of Federation of American Hospitals that "the proposed policy would result in

a reduction of DSH payments when Exhausted Days are removed from the Medicare fraction").

In addition, the Federation of American Hospitals alleged that "CMS lacks statutory authority to implement the proposed policy regarding Exhausted Days" because "Exhausted Days patients remain entitled to" certain Part A benefits even though they have "reached their coverage limit for inpatient hospital services." *Id.* at 789R. The Federation contended that, "[u]nder CMS's proposed interpretation of the DSH statute, it is impossible to reconcile the position that these patients are not entitled to Medicare Part A when they can receive other Part A services, such as skilled nursing services," *id.* at 790R, and "strongly urge[d] CMS not to finalize this policy," *id.*

Only one commenter, the BlueCross BlueShield Association, wrote in support of the proposed rule. BlueCross noted that it "agree[d] with the proposed change to include in the Medicaid percentage the patient days of dual eligible Medicare beneficiaries whose Medicare coverage has expired," but the Association nevertheless recommended "eliminating the requirement that the hospital submit documentation to the fiscal intermediary that justifies including the days in the Medicaid fraction." *Id.* at 566R.

Notably, two commenters wrote to express confusion about the Secretary's statement of the existing policy. The law firm Vinson & Elkins wrote, on its own behalf, in support of the proposed rule but "disagree[d] . . . that CMS' description of its past practice is correct." *Id.* at 860R. Specifically, Vinson & Elkins noted that the proposed rule was "at odds with the plain language of the regulation" governing the DSH adjustment, which stated that the Medicare fraction included "'covered patient days' only"—in other words, unexhausted days only. *Id.* at 861R (quoting 42 C.F.R. § 412.106(b)(2)(i) (2003)). That is, the Secretary's stated proposed rule was actually the manner in which dual-eligible exhausted days were currently being handled and the exact opposite of the policy the Secretary had put forth as the status quo. Vinson & Elkins

urged CMS to correct its misstatement, arguing that if the agency chose to stand by those statements, "it will squander its credibility with the courts and set[ ] itself up not only to lose as the issue is litigated but to subject itself to paying attorney fees and other sanctions." *Id.*

Southwest Consulting Associates ("SCA") also wrote to identify the misstatement, noting that "CMS' statement 'the days of patients who have exhausted their Medicare Part A coverage will no longer be included in the Medicare fraction' is inconsistent with CMS' current actual practice with respect to the Medicare fraction." *Id.* at 405R. SCA had obtained a letter from HHS's Office of General Counsel, dated August 14, 2001, "stating that only covered days [that is, unexhausted days] are used in the [Medicare] fraction." *Id.*; *see also id.* at 363R (letter from Linda Banks, CMS, to Christopher Keough, noting that "the Medicare/SSI denominator includes only the covered days," not exhausted days). Thus, SCA noted that "[t]o say that [exhausted] days 'will no longer be included'" in the Medicare fraction "may be a change in 'policy,' but it is clearly not a change in 'practice.' That begs the question—What was the 'policy'—what CMS professed or what it did?" *Id.* at 405R.

### 3. *2004 Final Rule*

On August 1, 2003, the Secretary issued a final rule for fiscal year 2004. Regarding the treatment of dual-eligible patient days, the Secretary noted that "[w]e are still reviewing the large number of comments received on the proposed provision relating to dual-eligible patient days in the May 19, 2003 [sic]. Due to the number and nature of the comments we received on our proposed policies, we are addressing the public comments in a separate document." Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates ("2004 Final Rule"), 68 Fed. Reg. 45,346, 45,421 (Aug. 1, 2003). The 2004 Final Rule did

not reference or address the commenters' concerns that the agency may have misstated its current policy by confusing its current practice with its proposed practice.

### 4. *2005 Proposed Rule and Second Comment Period*

On May 18, 2004, the Secretary issued a proposed rule offering "changes to the hospital inpatient prospective payment systems ["IPPS"] and fiscal year 2005 rates." Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates ("2005 Proposed Rule"), 69 Fed. Reg. 28,196, 28,196 (May 18, 2004) (capitalization omitted). As relevant to this case, the Secretary noted that "[i]n our May 19, 2003 IPPS proposed rule for FY 2004 (68 FR 27201), we proposed changes to our policy on counting available beds and patient days for the purposes of the DSH adjustment." *Id.* at 28,286. The Secretary explained that "[d]ue to the number and nature of the public comments received, we did not respond to the public comments on these proposals in the final rule for FY 2004 (68 FR 45415)." *Id.* Rather, the Secretary noted that the agency planned to address comments regarding the proposed new treatment of dual-eligible days "in the IPPS final rule for FY 2005." *Id.* The comment period for the 2005 Proposed Rule closed on July 12, 2004. *Id.* at 28,196. The 2005 Proposed Rule again did not mention any possible misstatement of the current handling of dual-eligible days or any confusion regarding the agency's current policy and its proposed policy.

Five days before the close of the comment period, on July 7, 2004, the Secretary acknowledged publicly in a notice posted on its website the fact that it had made precisely such a mistake. The Secretary explained:

> In the May 19, 2003 proposed rule (68 FR 27207) we indicated, with respect to dual-eligibles, that the policy described above currently applies even after the patient's Medicare Part A coverage is exhausted. That is, we stated that if a dual-eligible patient is admitted without any Medicare Part A coverage remaining, or the patient exhausts Medicare Part A coverage while an inpatient, the non-covered patient days are counted in the Medicare fraction. It has come to our attention, however, that this statement is not

> accurate.  Our policy has been that only covered patient days are included in the Medicare fraction.

AR at 340R.  The Secretary provided no other explanation for the misstatement and did not extend the comment period for the 2005 Proposed Rule, which was scheduled to end on July 12, 2004.

During the second comment period, many interested parties again wrote to the Secretary opposing the proposed rule and supporting what the Secretary had described as the status quo—which is the policy ultimately adopted in the 2005 Final Rule.  On July 2, 2004, the AHA submitted comments identical to its previous letter, arguing that the current formula is "consistent with statutory intent," that "the proposed change would place a significant new regulatory and administrative burden on hospitals, and that "this proposed change would result in reduced DSH payments to hospitals."  *Id.* at 428R.  In the days following the Secretary's July 7, 2004, website posting, numerous other commenters submitted letters identical to the AHA's comments opposing the proposed rule.  *See, e.g.*, *id.* at 30–31R (comments of California Healthcare Association dated July 12, 2004); *id.* at 130R (comments of New Jersey Hospital Association dated July 12, 2004); *id.* at 152R (comments of Catholic Healthcare West dated July 9, 2004); *id.* at 184R (comments of Michigan Health & Hospital Association dated July 9, 2004); *id.* at 193R (comments of Missouri Hospital Association dated July 9, 2004); *id.* at 254–55R (comments of Lincoln General Hospital dated July 8, 2004); *id.* at 267R (comments of Louisiana Hospital Association dated July 8, 2004); *id.* at 304R (comments of Ochsner Clinic Foundation dated July 8, 2004); *id.* at 323R (comments of Tennessee Hospital Association dated July 8, 2004); *id.* at 335R (comments of Touro Infirmary dated July 8, 2004); *id.* at 410R (comments of West Virginia Hospital Association dated July 7, 2004).

Still other commenters argued that the proposed rule "runs counter to the law and is otherwise inequitable to hospitals receiving DSH funding," *id.* at 297R (comments of Oakwood

Healthcare System dated July 8, 2004); that "[t]his change would require additional recordkeeping on the part of hospitals," *id.* at 163R (comments of Illinois Hospital Association dated July 9, 2004); and that "shifting the burden of proof to the providers and intermediaries will only make the task of determining eligible days more burdensome and costly to the facility," *id.* at 171R (comments of Jewish Hospital Healthcare Services dated July 9, 2004).

Notably, only one commenter mentioned the Secretary's website posting in its comments. The Federation of American Hospitals ("FAH"), which had written in opposition to the proposed rule during the first comment period, wrote to discuss the misstatement. FAH explained that, "[w]hen drafting its comments for FY 2004, FAH took at face value CMS's statement that, historically, Part A Exhausted/Noncovered Days have been included in the Medicare fraction." *Id.* at 81R. Thus, "[a]ssuming that this was true, and concerned that, if moved to the Medicaid fraction, the burden would be on the provider to identify these days, which might result in a lower number of days counted, FAH argued for a continuation of the existing policy to include these days in the Medicare percentage." *Id.* Since submitting its comments, however, "FAH ha[d] been informed that at least one knowledgeable fiscal intermediary, and possibly members of CMS staff, have indicated that further research has confirmed that such days are, in fact, not currently (and never were) included in the Medicare percentage." *Id.* at 82R. FAH thus urged the Secretary to "continue to accept comments on this issue." *Id.* at 81R. In addition, FAH argued that dual-eligible exhausted days should be included in the Medicare fraction, but that "[i]f such days are not counted in the Medicare fraction, then the days must be counted in the Medicaid fraction." *Id.* at 82R.

### 5.     *2005 Final Rule*

The second comment period closed as scheduled on July 12, 2004.  On August 11, 2004,

CMS issued its final rule for fiscal year 2005.  *See generally* Medicare Program; Changes to the

Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates ("2005 Final

Rule"), 69 Fed. Reg. 48,916 (Aug. 11, 2004).  Regarding the treatment of dual-eligible exhausted

days, the Secretary acknowledged, for the first time in the Federal Register, that the agency had

"misstated our current policy with regard to the treatment of certain inpatient days for dual-

eligibles in the proposed rule of May 19, 2003," *id.* at 49,098, and noted that "[a] notice to this

effect was posted on CMS's Web site on July 9, 2004," *id.* (internal citation omitted).  The

agency clarified that, "[i]n that proposed rule, we indicated that a dual-beneficiary is included in

the Medicare fraction even after the patient's Medicare Part A hospital coverage is exhausted.

. . . This statement was not accurate.  Our policy has been that only covered patient days are

included in the Medicare fraction."  *Id.*

The Secretary proceeded to address a variety of comments received during the comment

period for the 2004 and 2005 Proposed Rules.  First, the Secretary noted that CMS had "received

numerous comments that commenters were disturbed and confused by our recent Web site posting

regarding our policy on dual-eligible patient days," *id.*, and that many commenters "believed that

this posting was a modification or change in our current policy" that required "formal notification

by CMS" and an "opportunity for providers to comment," *id.*  The Secretary responded that the

notice "was not a change in our current policy" and that, because the posting "was not a new

proposal or policy change," the Secretary did not need to "utilize the rule making process in

correcting a misstatement that was made in the May 19, 2003 proposed rule regarding this

policy."  *Id.*

The Secretary acknowledged that other commenters had opposed the proposal to begin counting dual-eligible exhausted days in the Medicaid fraction rather than the Medicare fraction. *Id.* Specifically, commenters "objected that the proposal would result in a reduction of DSH payments when the exhausted coverage days are removed from the Medicare fraction and included in the Medicaid fraction" and that such a change "would dilute the value of that day and, therefore, reduce the overall patient percentage and the resulting DSH payment adjustment." *Id.* The Secretary highlighted one commenter who "observed that a patient who exhausts coverage for inpatient hospital services still remains entitled to other Medicare Part A benefits" and found it "difficult to reconcile the position that these patients are not entitled to Medicare Part A benefits when they can receive other covered Part A services." *Id.* Still other commenters "stated that these days should not be included in either the Medicare or Medicaid fraction." *Id.* Finally, the Secretary noted that many commenters "indicated that the proposal would put an increased administrative burden on the hospitals to support including these patient days in the Medicaid fraction." *Id.*

In response to these comments, the Secretary explained that this change had been proposed "to facilitate consistent handling of these days across all hospitals." *Id.* The Secretary acknowledged, however, "the point raised by the commenter that beneficiaries who have exhausted their Medicare Part A inpatient coverage may still be entitled to other Part A benefits." *Id.* The Secretary "agree[d] with the commenter that including the days in the Medicare fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid fraction," and that this outcome was "necessarily so because the denominator of the Medicare fraction (total Medicare inpatient days) is smaller than the denominator of the Medicaid fraction (total inpatient days)." *Id.* Nevertheless, the Secretary "disagree[d] with the commenter's

assertion that including days in the Medicaid fraction instead of the Medicare fraction always

results in a reduction in DSH payments," noting that, in some cases, "[t]he inclusion of such

patient days in the Medicare fraction has the result of decreasing the Medicare fraction in the

DSH percentage." *Id.*[3]

> After reviewing these comments, the Secretary stated the final rule:
>
> For these reasons, we have decided not to finalize our proposal stated in the May 19, 2003 proposed rule to include dual-eligible beneficiaries who have exhausted their Part A hospital coverage in the Medicaid fraction. Instead, we are adopting a policy to include the days associated with dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary has exhausted Medicare Part A hospital coverage. If the patient is entitled to Medicare Part A and SSI, the patient days will be included in both the numerator and denominator of the Medicare fraction. This policy will be effective for discharges occurring on or after October 1, 2004. We are revising our regulations at § 412.106(b)(2)(i) to include the days associated with dual-eligible beneficiaries in the Medicare fraction of the DSH calculation.

*Id.* at 49,099. In other words, the 2005 Final Rule formally adopted the policy that was

mistakenly put forth as the status quo in the 2004 Proposed Rule: including dual-eligible days in

the Medicare fraction, regardless of whether Part A coverage had been exhausted.

The final rule was eventually codified at 42 C.F.R. § 412.106(b)(2)(i). Before the 2005

Final Rule, that section explained that the Medicare fraction was calculated by determining the

"number of *covered* patient days" that were "associated with discharges occurring during each

month" and that were "furnished to patients who during that month were entitled to both

Medicare Part A and SSI, excluding those patients who received only State supplementation."

42 C.F.R. § 412.106(b)(2)(i) (2003) (emphasis added). After the 2005 Final Rule was adopted,

---

[3]     Specifically, the Secretary noted that "if a dual-eligible beneficiary has not exhausted Medicare Part A inpatient benefits, and is not entitled to SSI benefits, the patient days for that beneficiary are included in the Medicare fraction, but only in the denominator of the Medicare fraction (because the patient is not entitled to SSI benefits)," which would decrease the Medicare fraction in the DSH adjustment. 2005 Final Rule, 69 Fed. Reg. at 49,098.

this provision was amended to begin by determining the "number of patient days," with the word "covered" omitted.  42 C.F.R. § 412.106(b)(2)(i) (2004).

### C.     The Pending Lawsuit

The plaintiffs in this case are "general acute care hospitals" from across the country, Compl. ¶ 31, that "furnish[ ] inpatient and outpatient services to, *inter alia*, patients entitled to benefits under the Medicare program," *id.* ¶ 4.  The hospitals participate in the Medicare program as providers of services and receive reimbursements from the program on a regular basis.  At issue in this case are the hospitals' reimbursements for the 2005, 2006, and 2007 fiscal years. *See id.* ¶¶ 4–30.  The plaintiffs contend that, as a result of the 2005 Final Rule, they received "lesser [DSH] payments than the DSH amounts to which they were entitled, or no DSH payments at all."  Pls.' Mot. at 1.

Each plaintiff "filed a request for hearing within 180 days of receiving a Notice of Program Reimbursement" from its fiscal intermediary, or "within 180 days of the expiration of the 12 month period for issuance of a Notice of Program Reimbursement."  Compl. ¶ 77.  On November 29, 2016, the plaintiffs requested that the PRRB grant EJR so that they could seek judicial review of the 2005 Final Rule.  AR at 1.  On December 20, 2016, the PRRB assumed jurisdiction of the plaintiffs' appeals and granted EJR, holding that the PRRB was "without authority to decide the legal question of whether 42 C.F.R. § 412.106(b)(2)(i) is valid."  *Id.* at 6.[4] The plaintiffs filed their complaint in this action within sixty days of the PRRB's decision, arguing that the 2005 Final Rule was the result of a procedurally invalid rulemaking and that the rule itself was arbitrary and capricious.  Compl. ¶¶ 80–88.[5]  The plaintiffs sought vacatur of the

---

[4]     The *West Anaheim* plaintiffs requested EJR on February 23, 2017, and on March 15, 2017, the PRRB decided that it lacked jurisdiction over the plaintiffs' challenge.  *See* AR at 320–22.
[5]     The *West Anaheim* complaint was filed on May 11, 2017.  *See W. Anaheim Med. Ctr. v. Azar*, No. 17-cv-880, Compl. ("*West Anaheim* Compl.") at ¶ 50, ECF No. 1.

2005 Final Rule and the corresponding CMS Rule 1498R-2 "insofar as they require exhausted days and other non-covered days such as [Medicare Secondary Payer ("MSP")] days to be counted in the Medicare Fraction" and "requiring the Secretary to recalculate the DSH patient percentages of the Plaintiff Hospitals by not counting exhausted days, and other non-covered days such as MSP days, in the Medicare Fraction for the cost years at issue." *Id.* at 28.

After both the plaintiffs' motion and the defendant's cross-motion had been filed, but before briefing on those motions was complete, the parties jointly moved to consolidate this action and two other similar actions. *See generally W. Anaheim Med. Ctr. v. Azar*, No. 17-cv-315 (D.D.C. filed Feb. 21, 2017); *Dall. Reg'l Med. Ctr. v. Azar*, No. 17-cv-880 (D.D.C. filed May 11, 2017). That motion was granted and the cases were consolidated on January 9, 2018, at which time the *West Anaheim* and *Dallas Regional* cases were closed. *See* Order, dated January 9, 2018, ECF No. 20; Minute Entry (January 9, 2018). The plaintiffs' motion for summary judgment and the defendant's cross-motion for summary judgment are now ripe for review.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based on the pleadings, depositions, affidavits, and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (collecting cases). Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting in an APA case that "determining the facts is generally the agency's responsibility, not ours"). As a general rule, judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted; second alteration in original); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting that when applying arbitrary and capricious standard under the APA, "[t]he focal point for judicial review should be the administrative record already in existence . . . ." (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).

### B. Administrative Procedure Act

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D); *see also Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir.

2014) (citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or capricious provision, under § 706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs" of the APA. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.* ("*ADPSO*"), 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

To pass arbitrary and capricious muster, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983) (internal quotation marks omitted). As the D.C. Circuit has explained, a party challenging an agency action as arbitrary and capricious "must show the agency action is not a product of reasoned decisionmaking." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016). "This is 'a heavy burden,' since *State Farm* entails a 'very deferential scope of review' that forbids a court from 'substitut[ing] its judgment for that of the agency.'" *Id.* (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000)); *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same); *Judulang v. Holder*, 565 U.S. 42, 52–53 (2011) (same). Particularly when "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988)). That said, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at 53. Simply put, "the agency must explain why it decided to act as it did." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

The D.C. Circuit has summarized the circumstances under which an agency action would normally be "arbitrary and capricious" to include "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) (quoting *State Farm*, 463 U.S. at 43). Thus, when an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cty. of L.A. v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see also Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is [ ] glaring [ ] we can declare with confidence that the agency action was arbitrary and capricious" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks omitted)). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in original).

## III.   DISCUSSION

The plaintiffs challenge the 2005 Final Rule on two grounds. First, the plaintiffs argue that the 2005 Final Rule is procedurally deficient under the APA and the Medicare Act because the Rule was not a logical outgrowth of the proposed rules, thereby depriving affected hospitals

of fair notice and the ability to submit comments. Pls.' Mem. at 9–19.[6] Second, the plaintiffs contend that the 2005 Final Rule is substantively invalid because it was not the result of reasoned decisionmaking. *Id.* at 19–25. The defendant responds that the 2005 Final Rule was the logical outgrowth of the 2004 Proposed Rule and that the 2005 Final Rule adequately explains the Secretary's reasoning. Def.'s Mem. at 13–23. These arguments are taken in turn.

### A.    The 2005 Final Rule Was Promulgated with Adequate Notice and Comment Procedures

The plaintiffs contend that "[t]he rulemaking record leading up to the FY 2005 Final Rule demonstrates interested parties were not provided fair notice of the policy the Secretary ultimately finalized in his FY 2005 Final Rule" because "the Secretary proposed in the FY 2004 Proposed Rule the exact opposite of the policy he summarily 'finalized' in the FY 2005 Final Rule." Pls.' Mem. at 10. The defendant counters that the APA's notice requirement was satisfied because "[t]he final rule was a logical outgrowth of the Secretary's proposal" in the 2004 and 2005 Proposed Rules. Def.'s Mem. at 13. Notwithstanding the sloppy and confusing misstatements in the 2004 and 2005 Proposed Rules, which make this a close case, the defendant has the better argument.

### 1.    *The Logical Outgrowth Test*

The APA generally requires a federal agency engaged in rulemaking to engage in notice and comment procedures. *See* 5 U.S.C. § 553(b). Specifically, a "notice of proposed rule making" must be "published in the Federal Register" and notify the public of "the time, place,

---

[6]    Although the plaintiffs argue that the "2005 Final Rule is procedurally deficient under both the APA and the Medicare Act," Pls.' Mem. at 9 (capitalization omitted), the parties' arguments are based only on the APA. *See* Pls.' Mem. at 9–19; Def.'s Mem. at 13–18. As relevant to this dispute, the requirements of the APA and the Medicare Act are substantially similar: the Medicare Act provides that if a final regulation "is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation." 42 U.S.C. § 1395hh(a)(4). Thus, the conclusions reached on the APA claim are equally applicable to the Medicare Act claim.

and nature of public rule making proceedings"; "the legal authority under which the rule is proposed"; and "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(1)–(3). Once an agency issues notice of a proposed rule, however, the agency is not required to finalize that proposed rule. Rather, "[a]gencies are free— indeed, they are encouraged—to modify proposed rules as a result of the comments they receive." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004).

"Given the strictures of notice-and-comment rulemaking," however, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (citing *Shell Oil Co. v. EPA*, 950 F.2d 741, 750–51 (D.C. Cir. 1991)); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) ("An agency may promulgate a rule that differs from a proposed rule only if the final rule is a 'logical outgrowth' of the proposed rule." (citing *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012))); *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) ("The traditional APA 'logical outgrowth' test applies where an agency changes its final regulation in some way from the proposed regulation for which it provided notice and requested comment, as required under the APA."). The "logical outgrowth" doctrine "does not extend to a final rule that finds no roots in the agency's proposal because '[s]omething is not a logical outgrowth of nothing,'" *Envtl. Integrity Project*, 425 F.3d at 996 (alteration in original) (quoting *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994)), nor does the doctrine apply "where interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was 'surprisingly distant' from the Agency's proposal," *id.* (internal citations omitted) (quoting *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000), and *Int'l Union, United Mine Workers of Am. v. Mine Safety*

*& Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005)).  That is, courts will "refuse[ ] to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities."  *Id.*

A final rule is considered a logical outgrowth of a proposed rule "only if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."  *Int'l Union*, 407 F.3d at 1259 (internal quotation marks omitted) (quoting *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952); *see also Allina*, 746 F.3d at 1107 ("A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible."  (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009))).  "[W]hile the 'logical outgrowth' standard does not require the agency to assiduously lay out every detail of a proposed rule for comment, it does require that the 'agency . . . publish notice of either the substance of a proposed rule or a description of the subjects and issues covered by a proposed rule.'"  *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (internal quotation marks omitted) (quoting *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1310–11 (D.C. Cir. 1991)).  As the D.C. Circuit has noted, "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."  *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989).

### 2. *Analysis*

The 2005 Final Rule is a logical outgrowth of the 2004 Proposed Rule.  In the 2004 Proposed Rule, the Secretary explained that the current policy was to include dual-eligible exhausted days "in the Medicare fraction before and after Medicare coverage is exhausted." 2004 Proposed Rule, 68 Fed. Reg. at 27,207.  The Secretary then "propos[ed] to change our policy, to begin to count in the Medicaid fraction of the DSH patient percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired."  *Id.*  The 2004 Proposed

Rule thus put parties on notice that either of these two options might be adopted.  Indeed, the Secretary's stated current policy—including dual-eligible exhausted days in the Medicare fraction—is precisely the rule that was ultimately adopted in the 2005 Final Rule.  In the Final Rule, the Secretary explained that "we have decided not to finalize our proposal stated in the May 19, 2003 proposed rule" and that, "[i]nstead, we are adopting a policy to include the days associated with dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary has exhausted Medicare Part A hospital coverage."  2005 Final Rule, 69 Fed. Reg. at 49,099.

The plaintiffs posit that merely "mention[ing] in a proposed rule [ ] the policy ultimately adopted" does not "put parties on notice that the agency may adopt the mentioned course of action," Pls.' Opp'n Def.'s Cross-Mot. Summ. J. & Reply Supp. Mot. Summ. J. ("Pls.' Reply") at 2, ECF No. 25.  Even if that position were correct, the Secretary did more than merely "mention" the final policy here.  Rather, the Secretary identified the two options that were available and chose between them.  As the plaintiffs recognize, "the unambiguous language of the Medicare Act requires such days be included in one fraction or the other."  Pls.' Mot. at 1–2.[7] The 2004 Proposed Rule plainly identified these two possibilities, putting parties on notice that either one was a possible outcome.  Moreover, the plain text of the 2004 Proposed Rule put interested parties on notice that the Secretary was considering "chang[ing] our policy" and identified the rule that was ultimately adopted, thus providing the requisite notice.

---

[7]     The plaintiffs at times seem to dispute that dual-eligible exhausted days must be included in either the Medicare or the Medicaid fraction, arguing that, "complicating the matter, the actual practice prior to the rulemaking challenged in this case was that, at least for some years, such days were nonsensically excluded from both fractions." Pls.' Mem. at 12 (quoting *Catholic Health Initiatives*, 718 F.3d at 921).  This dispute rests on a misreading of *Catholic Health*, which noted only that "the policy of excluding dual-eligible exhausted days from the Medicaid fraction was announced [in 2000], and the [2004] rulemaking was simply a reiteration of this position." *Catholic Health Initiatives*, 718 F.3d at 921.  *Catholic Health Initiatives* does not indicate that the prior practice was to exclude dual-eligible exhausted days from both fractions.  In addition, the plaintiffs have acknowledged that "the unambiguous language of the Medicare Act requires such days be included in one fraction or the other."  Pls.' Mot. at 1–2.

Nor does the fact that the Secretary misstated the current policy affect this analysis.  The 2004 Proposed Rule clearly offered two options that were available to the Secretary: either the misstated "current policy" of including dual-eligible exhausted days in the Medicare fraction, or the proposed policy of including such days in the Medicaid fraction.  Even though the stated "current policy" was, in fact, not the Secretary's actual policy, the 2004 Proposed Rule gave interested parties notice that the mistaken current policy might be adopted, because "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."  *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (quoting *Am. Iron & Steel Inst.*, 886 F.2d at 400).

Furthermore, even though "[t]he Secretary eventually acknowledged his misstatements," Pls.' Mem. at 12, and though "the Secretary's proposal negatively mention[ed] the policy ultimately adopted," Pls.' Reply at 4, these facts also do not invalidate the 2005 Final Rule.  While the Secretary did acknowledge, both in a July 7, 2004, website posting and in the 2005 Final Rule, that he had misstated the current policy, the 2004 Proposed Rule still adequately notified interested parties that both the misstated current policy and the proposed new policy were possible outcomes of the rulemaking process.  The Secretary's allegedly "negative[ ]" mention" of the policy that was ultimately adopted does not preclude the Secretary from changing his outlook after reviewing comments on the virtues of that policy.  Rather, the Secretary was free "to modify [the] proposed rule[ ] as a result of the comments [he] receive[d]." *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 951.

Indeed, the Administrative Record includes many comments opposing the proposed rule, indicating that commenters were on notice that the Secretary was deciding between two options: including dual-eligible exhausted days in either the Medicare fraction or the Medicaid fraction. Numerous commenters during both the initial and the second comment periods wrote in support

of the misstated status quo—that is, the policy that was ultimately adopted—to "urge that CMS not change the rules for counting dual-eligible days." AR at 583R (comments of Healthcare Association of New York State); *see also id.* at 428R (comments of American Hospital Association) ("There are important reasons *not* to make this change."). Only one commenter wrote in support of the proposed change. *See id.* at 566R (comments of BlueCross BlueShield Association) ("We agree with the proposed change to include in the Medicaid percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired."). The plethora of comments in support of the rule ultimately adopted by the Secretary indicates that "[c]ommenters clearly understood that [this change] w[as] under consideration," *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998), and is "evidence that sufficient notice was given," *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 134 (D.D.C. 2016).

The plaintiffs discount "[t]he fact that some commenters actually submitted comments" advocating for the ultimately adopted proposal as "of little significance." *Fertilizer Inst.*, 935 F.2d at 1312. In *Fertilizer Institute*, the EPA issued a proposed rule regarding the threshold "reportable quantity" ("RQ") for radionuclides emitted into the environment, *id.* at 1311, but the final rule instead created several "administrative exemptions" that "excuse parties from notifying the EPA when RQs of radionuclides are released," *id.* at 1310. The possibility of administrative exemptions was never mentioned in the proposed rule, but the EPA argued that the exemptions were a logical outgrowth in part because "several parties did in fact suggest that administrative exemptions be created." *Id.* at 1311. The D.C. Circuit concluded that "[t]he fact that some commenters actually submitted comments suggesting the creation of administrative exemptions is of little significance" because the proposed rule "was not sufficient to advise interested parties that comments directed to the creation of administrative exemptions should be made." *Id.* at

1312.  By contrast, in this case the issue of a proposed change and the possible outcomes of that

change were directly mentioned in the 2004 Proposed Rule.  The 2004 Proposed Rule expressly

identified the two options available to the Secretary: either include dual-eligible exhausted days

in the Medicare fraction, as the misstated current policy did, or adopt the proposed rule and

include dual-eligible exhausted days in the Medicaid fraction.  Interested parties were therefore

on notice that they should comment either on whether the proposed policy should be adopted or

on whether the stated status quo should be maintained.

      The plaintiffs primarily rest their argument on three cases, which ultimately offer little

support.  First, the plaintiffs cite *Allina Health Services*, which the plaintiffs characterize as

"consider[ing] a virtually indistinguishable legal question," resulting in the D.C. Circuit

"concluding that a similar policy in the same FY 2005 Final Rule was procedurally invalid."

Pls.' Mem. at 14.  *Allina Health Services* addressed a provision of the 2005 Final Rule regarding

the fraction in which Medicare Part C enrollees should be included for purposes of the DSH

calculation.  *Allina Health Servs.*, 746 F.3d at 1105.  In the relevant portion of the 2004 Proposed

Rule, the Secretary stated that "we are proposing to *clarify* that once a beneficiary elects

Medicare Part C, those patient days attributable to the beneficiary should not be included in the

Medicare fraction" but should instead be included in the Medicaid fraction.  2004 Proposed Rule,

68 Fed. Reg. at 27,208 (emphasis added).  In the 2005 Final Rule, however, the Secretary made

no such "clarif[ication]" and instead "adopt[ed] a policy to include the patient days for [Part C]

beneficiaries in the Medicare fraction"—the exact opposite of the policy the Secretary had

"propos[ed] to clarify."  2005 Final Rule, 69 Fed. Reg. at 49,099.  The D.C. Circuit concluded

that this result was not a logical outgrowth of the Secretary's "propos[al] to clarify," holding that

"[t]he hospitals should not be held to have anticipated that the Secretary's 'proposal to clarify'

could have meant that the Secretary was open to reconsidering existing policy.  The word

'clarify' does not suggest that a potential major issue is open for discussion." *Allina Health*

*Servs.*, 746 F.3d at 1108.

In this case, by contrast, the 2004 Proposed Rule clearly indicated that the Secretary was

"proposing to change our policy."  2004 Proposed Rule, 68 Fed. Reg. at 27,207.  Unlike the

proposal at issue in *Allina*, which merely stated that the Secretary was considering a

"clarification," the proposal at issue here put interested parties on notice not only that a change

was possible but also that the proffered change might be rejected in favor of the stated current

policy.  Rather than using the word "clarify" to "unfairly mask[ ] a true policy change (and

thereby depriv[e] the public of a meaningful opportunity to comment)," *Abington Mem'l Hosp.*,

216 F. Supp. 3d at 133, the Secretary's 2004 Proposed Rule broadcast that he was considering a

change and invited the public to comment on that proposal.  By juxtaposing the stated current

policy of including dual-eligible exhausted days in the Medicare fraction against the proposed

policy of including such days in the Medicaid fraction, the 2004 Proposed Rule "characteriz[ed]

[ ] the issue as an open, binary choice between two equally valid interpretations," *Allina Health*

*Servs. v. Sebelius*, 904 F. Supp. 2d 75, 90 (D.D.C. 2012), *rev'd in part on other grounds by* 746

F.3d 1102 (D.C. Cir. 2014), and gave notice that either of the two interpretations would be

adopted.  *Allina* therefore does not control the outcome here, where interested parties properly

were notified of a proposed change and given adequate opportunity to comment.

The plaintiffs also contend that this case is similar to *International Union*, in which the

D.C. Circuit struck down a final rule as not being a logical outgrowth of a proposed rule.  *See*

Pls.' Mem. at 18–19.  In that case, the Mine Safety and Health Administration issued a proposed

rule that "[a] *minimum* air velocity of 300 feet per minute must be maintained" through point-

feed regulators in mines.  *Int'l Union*, 407 F.3d at 1259 (internal quotation marks omitted; emphasis and alteration in original).  The final rule, however, provided that "[t]he *maximum* air velocity in the belt entry must be no greater than 500 feet per minute."  *Id.* (internal quotation marks omitted; emphasis and alteration in original).  The D.C. Circuit concluded that "the maximum cap provision of the final rule was not a 'logical outgrowth' of the proposed rule," which "did not indicate the possibility of a maximum cap much less one set at 500 [feet per minute]."  *Id.* at 1259–60.  Here, by contrast, the 2004 Proposed Rule "indicate[d] the possibility" that dual-eligible exhausted days would be counted in the Medicare fraction, as was ultimately adopted, as well as the possibility that the stated current policy might be changed to count dual-eligible exhausted days in the Medicaid fraction.  The notice concerns highlighted in *International Union* are thus not present in this case.

Finally, the plaintiffs rely on *Environmental Integrity Project* to argue that "the Agency cannot bootstrap notice from comment" by pointing to comments received as evidence that proper notice was given.  Pls.' Reply at 6 (capitalization omitted).  In that case, the Environmental Protection Agency ("EPA") had proposed to "clarify" a reporting requirement by "codifying" an interpretation of the Clean Air Act that the EPA had embraced in prior litigation.  *Envtl. Integrity Project*, 425 F.3d at 994.  In the final rule, however, the EPA decided not to clarify the relevant provision and instead "switched course and adopted the opposition position."  *Id.* at 995.  In concluding that the EPA's final rule was promulgated without proper notice and comment, the D.C. Circuit did not discuss the EPA's argument that the final rule was justified on the basis of public comments.  *See id.* at 995–98.  Rather, the D.C. Circuit noted that the EPA's "propos[al] to codify its interpretation" did not provide adequate notice of "the Agency's decision to repudiate its proposed interpretation and adopt its inverse."  *Id.* at 998.  Here, by

contrast, the Secretary plainly stated in the 2004 Proposed Rule that he was considering "chang[ing] our policy" from the existing policy of including dual-eligible exhausted days in the Medicare formula, thereby giving notice both that he was considering changing the policy and that, if the proposal was rejected, the stated current policy would remain in effect.

Unlike the proposed rules in *Allina Health Services*, *International Union*, and *Environmental Integrity Project*, the 2004 Proposed Rule clearly stated that the Secretary was "proposing to change" a policy and identified the two possible choices: dual-eligible exhausted days would be included in either the Medicare fraction, or the Medicaid fraction. The 2005 Final Rule then adopted one of those two stated options. Accordingly, because the 2005 Final Rule is a logical outgrowth of the 2004 Proposed Rule, the 2005 Final Rule was promulgated with adequate notice and comment procedures and is not procedurally defective.

### B.     The 2005 Final Rule Was the Product of Reasoned Decisionmaking

The plaintiffs next argue that "the policy finalized in the FY 2005 Final Rule was the product of arbitrary and capricious rulemaking" for three reasons: (1) "[t]he Secretary did not provide much by way of an explanation for his about-face in proposing to count exhausted days," Pls.' Mem. at 19; (2) "the Secretary apparently relied on a flawed understanding regarding the policy's impact on DSH patient percentage calculations," *id.* at 22; and (3) "the Secretary continued to express confusion about his then-current policy and his new policy," *id.* at 24. The defendant counters that "[t]he Secretary adequately explained the choice he made," Def.'s Mem. at 18, that the Secretary understood the impact of his proposal, *see id.* at 21, and that the Secretary "was certainly aware that he was changing positions" when he revised the regulations, *id.* at 22. Again, although close, the defendant has the better arguments.

### 1.    *Reasoned Decisionmaking*

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").  An agency therefore "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43).  "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."  *Cty. of L.A.*, 192 F.3d at 1021 (internal quotation marks and citation omitted).

Under this framework, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars*, 136 S. Ct. at 2125 (citing *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)).  To provide a "reasoned explanation" for a change in policy, the agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also State Farm*, 463 U.S. at 57 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances.  But an agency changing its course must supply a reasoned analysis." (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971))).  The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one," however.  *Fox*, 556 U.S. at 515.  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency believes it to be better, which the conscious change of course adequately indicates." *Id.*

### 2.     *Analysis*

The 2005 Final Rule provides adequate explanations for the Secretary's decision to begin counting dual-eligible exhausted days in the Medicare fraction.  In the Final Rule, the Secretary detailed several themes of the comments received on the proposed rule, and he explained that the agency "agree[d] with" a comment that "including the days in the Medicare fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid fraction." 2005 Final Rule, 69 Fed. Reg. at 49,098.  The Secretary also acknowledged another commenter's argument that "beneficiaries who have exhausted their Medicare Part A inpatient coverage may still be entitled to other Part A benefits." *Id.*  These two observations help explain the Secretary's decision to count dual-eligible exhausted days in the Medicare fraction: the days would have "a greater impact" when included in the Medicare fraction, and patients who were entitled to other Part A benefits beyond inpatient hospital stays would logically be treated as still being "entitled to benefits under [Medicare] part A," as the statutory definition of the Medicare fraction states.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  Indeed, the DSH adjustment aims to compensate hospitals for treating sick, low-income patients—in other words, individuals who are likely to exhaust their Part A coverage but who remain in the hospital for treatment.  Including patient days for these individuals in the Medicare fraction, where the days will often have a greater impact, furthers the purpose of the DSH adjustment.  *See* Def.'s Mem. at 21.

Notably, the Sixth Circuit has examined this same rule and concluded that the 2005 Final Rule "appears to be the result of a reasoned deliberative process, reflecting HHS's experience in case-by-case administrative adjudications and in federal-court litigation, and its benefitting from

stakeholder input through notice-and-comment rulemaking." *Metro. Hosp. v. U.S. Dep't of Health & Human Servs.*, 712 F.3d 248, 268 (6th Cir. 2013). In *Metropolitan Hospital*, the Sixth Circuit addressed whether the interpretation set forth in the 2005 Final Rule was entitled to *Chevron* deference, concluding that "the rulemaking process was not arbitrary and that the resulting regulation is a permissible construction of the DPP provision that warrants judicial deference under *Chevron*." *Id.* at 270. The Sixth Circuit noted that the Secretary had "appropriately considered the[ ] comments" without "blindly accept[ing] them as true," *id.* at 270, had "recognized th[e] inconsistency" in his prior interpretations of the phrase "entitled to benefits under [Medicare] part A," *id.* at 269, and had adopted the interpretation that would "facilitate consistent handling of these days across all hospitals," 2005 Final Rule, 69 Fed. Reg.at 49,098. The court thus concluded that the 2005 Final Rule was "the product of a reasoned analysis" rather than "an ad hoc determination meant to unduly restrict DSH adjustments." *Metro. Hosp.*, 712 F.3d at 269. Although not binding on this Court, the Sixth Circuit's reasoning is persuasive, lending strength to the defendant's argument that the 2005 Final Rule was the product of reasoned decisionmaking.

The plaintiffs nevertheless argue that "'acknowledging a point' and 'agree[ing] with a commenter' about the 'impact' of a policy do not provide the explanation demanded by the APA" because "the Secretary did not explain whether he agreed with the commenter point [sic] that the Secretary 'acknowledged.'" Pls.' Mem. at 20. The plaintiffs' own brief belies that argument, as the plaintiffs recognize that the Secretary "agree[d] with [the] commenter." *Id.* After agreeing with this commenter, the Secretary went on to state that, "[f]or these reasons," he had "decided not to finalize our proposal stated in the May 19, 2003 proposed rule." 2005 Final

Rule, 69 Fed. Reg. at 49,099. The text of the 2005 Final Rule indicates that the Secretary carefully considered the comments and used those comments in reaching a well-reasoned decision.

The plaintiffs also argue that the Secretary's decision is arbitrary and capricious because the Secretary "apparently relied on a flawed understanding regarding the policy's impact on DSH patient percentage calculations." Pls.' Mem. at 22. Specifically, the plaintiffs contend that the Secretary was "simply wrong" in his statement that "including the days in the Medicare Fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid Fraction," 2005 Final Rule, 69 Fed. Reg. at 49,098, and in his statement that "[t]his is necessarily so because the denominator of the Medicare fraction (total Medicare inpatient days) is smaller than the denominator of the Medicaid fraction (total inpatient days)," id.[8] The Secretary understood, however, that "including days in the Medicaid fraction instead of the Medicare fraction" would not always "result[ ] in a reduction in DSH payments." Id. Rather, the Secretary noted that "if a dual-eligible beneficiary has not exhausted Medicare Part A inpatient benefits, and is not entitled to SSI benefits, the patient days for that beneficiary are included in the Medicare fraction, but only in the denominator of the Medicare fraction (because the patient

---

[8]     In support of this argument, the plaintiffs offer a hypothetical situation: Suppose that, ignoring dual-eligible exhausted days, a hospital's Medicare fraction is 7 percent (that is, 70 out of 1000 Medicare covered days are attributable to patients with unexhausted Part A benefits and also entitled to SSI benefits). Suppose also that, again ignoring dual-eligible exhausted days, the same hospital's Medicaid fraction is also 7 percent (that is, 140 out of 2000 total covered days were attributable to patients eligible for Medicaid but not entitled to Medicare Part A benefits). If this hospital also had 50 dual-eligible exhausted days for patients not entitled to SSI benefits, then including the exhausted days in the Medicare fraction would have the impact of reducing the Medicare fraction to 6.67 percent (or 70 out of 1050 Medicare covered days), because the 50 exhausted days would be added only to the denominator. By contrast, including the exhausted days in the Medicaid fraction would increase the Medicaid fraction to 9.5 percent (or 190 out of 2000 days), because the days would be included in only the numerator. See Pls.' Mem. at 22–23. The plaintiffs' example does not acknowledge, however, that if the hospital instead had 50 dual-eligible exhausted days for patients who were entitled to SSI benefits, then including the exhausted days in the Medicare fraction would increase the Medicare fraction from 7 percent to 11.4 percent (or 120 days out of 1050 Medicare covered days), while including those days in the Medicaid fraction would increase the Medicaid fraction from 7 percent to only 9.5 percent, as shown above. Indeed, the poorest patients are those that are most likely to be entitled to SSI benefits, see Catholic Health, 718 F.3d at 916 (characterizing SSI as "welfare"), and the inclusion of their exhausted days in both the numerator and the denominator of the Medicare fraction will therefore have the effect, generally, of increasing the DPP more than including those days in the Medicaid fraction would increase the DPP.

is not entitled to SSI benefits)." *Id.* The Secretary further stated that "[t]he inclusion of such patient days in the Medicare fraction has the result of decreasing the Medicare fraction in the DSH patient percentage," *id.*, a recognition in line with the hypothetical presented in the plaintiffs' brief. *See* note 8, *supra*. As the defendant argues, "Plaintiffs are simply wrong to suggest that the Secretary was unaware of this possible effect." Def.'s Mem. at 21.

The plaintiffs also argue that the final rule was arbitrary and capricious because "the Secretary failed to acknowledge the policy he was changing." Pls.' Mem. at 24. The 2005 Final Rule expressly states, however, that "[o]ur policy has been that only covered [that is, unexhausted] patient days are included in the Medicare fraction." 2005 Final Rule, 69 Fed. Reg. at 49,098. The Secretary also noted that he had "inadvertently misstated" the current policy in the 2004 Proposed Rule and included a link to the July 7, 2004, website posting notifying the public of that misstatement. *Id.* While the Secretary could have been clearer throughout the rulemaking process regarding the current policy and the proposed changes to current policy, the Secretary did acknowledge the policy that he was changing, as required by the APA. *See Fox*, 556 U.S. at 515.

The plaintiffs also allege that the Secretary "utterly failed to acknowledge that removing the reference to 'covered' days from 42 C.F.R. § 412.106(b)(2) . . . would have an effect on other non-covered days such as MSP days"—that is, days for which a patient does not receive Medicare Part A benefits because another entity paid for the inpatient hospital stay. Pls.' Mem. at 25. Notably, the plaintiffs raised this claim as part of their argument that the 2005 Final Rule was arbitrary and capricious, not that the 2005 Final Rule was procedurally deficient, thereby waiving the latter argument. *See* Pl.'s Mem. at 25 (arguing that "[t]he Secretary's policy of counting non-covered days such as exhausted days and MSP days in the Medicare Fraction is substantively invalid, as the Secretary did not provide a reasoned explanation for the change and

did not even demonstrate a basic understanding of his prior policy, the change he promulgated, and the effects of the change"). Nevertheless, even assuming both arguments were properly raised, the Secretary's failure to specifically discuss the 2005 Final Rule's impact on MSP days does not invalidate the rule on either score. The Secretary stated in the 2005 Final Rule that "[o]ur policy has been that only covered patient days are included in the Medicare fraction," 2005 Final Rule, 69 Fed. Reg. 49,098, meaning that only days for which Medicare Part A benefits were actually received were included in the Medicare fraction. That statement would also exclude from the Medicare fraction MSP days, or days when a patient is entitled to Medicare Part A benefits but does not actually receive those benefits because a secondary payer covered the costs.

Moreover, as the defendant points out, the 2005 Final Rule concerned whether a patient could be "entitled to benefits under [Medicare] Part A" when the patient did not actually receive any Part A benefits. Def.'s Reply Supp. Cross-Mot. Summ. J. ("Def.'s Reply") at 8 n.3, ECF No. 29. "If the Secretary answered in the affirmative (as he ultimately did) then patient days for Medicare beneficiaries would be included in the Medicare fraction, regardless of whether the program paid for their care on that day." *Id.* That policy logically would also apply to a patient who was entitled to benefits under Part A, but who did not actually receive any Part A benefits because payment had already been made by another source. Indeed, the D.C. Circuit has accorded deference to the Secretary's position that "entitlement to Medicare benefits is simply a matter of meeting the statutory criteria, not a matter of receiving payment." *Catholic Health Initiatives*, 718 F.3d at 919–20 (citing 42 C.F.R. § 400.202 ("Entitled means that an individual meets all the requirements for Medicare benefits.")). Four appellate courts also have concluded that "the Medicaid proxy includes all patient days for which a person was eligible for Medicaid

benefits, whether or not Medicaid actually paid for those days of service," *Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984, 991 (4th Cir. 1996), indicating that the same conclusion about the Medicare proxy reasonably could have been expected and strengthening the defendant's argument that "there is no reason to think that the Secretary failed to realize" that his interpretation "would have consequences beyond the dual-eligible patient days that were the explicit subject of this rulemaking." Def.'s Mem. at 22; *see also id.* at 5 n.1; *Legacy Emanuel Hosp. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (Mem.) (8th Cir. 1996) (per curiam); *Jewish Hosp. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 276 (6th Cir. 1994). As the defendant argues, "[t]hat the Secretary did not provide an elaborate typology of all such days" that might possibly have been affected by the rule "does not undermine the rationality of his decision to adopt this interpretation." Def.'s Reply at 10 n.4. The failure to specifically mention MSP days thus does not render the 2005 Final Rule procedurally deficient or arbitrary and capricious.

Finally, the plaintiffs repeatedly contend that the Secretary's "actual practice prior to the rulemaking challenged in this case" was "nonsensical" and must be corrected. Pls.' Mem. at 7 ("[T]he actual practice prior to the rulemaking challenged in this case was that, at least for some years, such days were nonsensically excluded from both fractions."); *id.* at 26 ("Any pre-FY 2005 practice of excluding such days from both fractions is nonsensical."). As already discussed, it is not clear that the Secretary had such a practice of excluding dual-eligible exhausted days from both fractions. *See supra* note 7. Nevertheless, to the extent that the plaintiffs suggest the Secretary's practice prior to the 2005 Final Rule was "nonsensical," the 2005 Final Rule is an improvement as it sets forth a clear policy of including dual-eligible exhausted days in the Medicare fraction.

Given that the FY 2005 Final Rule is procedurally sound and the product of reasoned decisionmaking, it is unnecessary to address the plaintiffs' argument that "CMS Ruling 1498R must also be vacated to the extent based on the deficient and invalid policy in the FY 2005 Final Rule," Pls.' Mem. at 26, and the plaintiffs' argument that vacatur with an injunction, rather than a remand, is the appropriate remedy, *id.* at 25–28.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' motions for summary judgment are denied and the defendant's cross-motions for summary judgment are granted. An appropriate Order accompanies this Memorandum Opinion.

Date: June 29, 2018

_____
BERYL A. HOWELL
Chief Judge